UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2024 FEB 22 PM 2: 31

CLERK
BY_____
DEPUTY CLERK

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | Case No. 2:16-cr-19 |
| | ) | |
| JAIDEN PAIGE | ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Based on the preponderance of the evidence, the court makes the following findings of fact:

1. After pleading guilty to Possession with Intent to Distribute Heroin, Distribution of Heroin, and Conspiracy to Distribute 100 Grams or More of Heroin, on July 18, 2017, the court sentenced Defendant Jaiden Paige to 139 months of incarceration, concurrent on each count, to be followed by five years of supervised release.

2. The parties' Fed. R. Crim. P. 11(c)(1)(C) agreement capped the sentence at 176 months. Defendant's advisory sentencing guidelines range was 292 to 365 months.

**The Presentence Report ("PSR").**

3. At the time of the court's sentencing, Defendant was in criminal history category V and in criminal history VI as a career offender. His criminal history at the time included a felony First Degree Robbery and a prior conviction in this court for conspiracy to distribute 500 grams or more of cocaine.

4. Defendant's offense conduct included the possession of firearms and a credible threat of violence that could have resulted in death or serious bodily injury.

5. The court adopted the PSR as its findings of fact after a contested evidentiary hearing.

6. The PSR includes evidence that an individual reported to have been stripped naked and tied down by Defendant, who put a gun to his head and threatened to drill into his head with a carpenter's tool because Defendant believed the individual had stolen his drugs. Two other individuals made similar claims. A female claimed Defendant came to her home, displayed a handgun, and threatened to hurt her daughter. Among other things, Defendant denied threatening to "take care" of an individual with a handgun or using a firearm to threaten others.

7. The government seeks to introduce evidence from the PSR to establish that Defendant's "2017 Presentence Report confirms that [Defendant] has a history of tying up and threatening to harm a person he suspected of stealing from him." (Doc. 281 at 6) (citing PSR ¶ 25(c)). Defendant opposes the court's consideration of evidence from the PSR.

8. The government proffers the contested evidence under Fed. R. Evid. 404(b)[1] and to bolster a witness's credibility.[2] The court finds the probative value of this evidence is limited, it is highly prejudicial, and the characteristics of the incidents in the PSR and the alleged offense conduct do not reflect a signature crime.[3] It, however, considers this evidence to the

---

[1] *See* Fed. R. Evid. 404(b); *see also United States v. Moon*, 802 F.3d 135, 144 (1st Cir. 2015) (holding evidence of a defendant's drug dealing was admissible to prove his motive to possess a firearm); *United States v. Luna*, 21 F.3d 874, 878 n.1 (9th Cir. 1994) (observing that while the relevance of other 404(b) evidence to the defendant's intent often requires some degree of similarity between the two crimes, the degree of similarity is less than necessary to prove identity).

[2] *See United States v. Green*, 617 F.3d 233, 250 (3d Cir. 2010) (permitting government's use of 404(b) evidence to "improve [a witness's] credibility"); *United States v. Scarfo*, 850 F.2d 1015, 1020-21 (3d Cir. 1988) (concluding district court did not abuse its discretion in admitting 404(b) evidence "to evaluate the witnesses' motives for cooperating with the government" and "to evaluate . . . the extent to which fear swayed the two witnesses").

[3] A "signature crime" generally requires significant similarities between the other crimes and the charged crime. *See United States v. Sanchez*, 988 F.2d 1384, 1393 (5th Cir. 1993) (observing that a common basis for admitting other crimes evidence is to show identity through modus operandi

2

extent it rebuts Defendant's argument that Mr. Clark's allegations of two assaults are fantastical, improbable, and incredible.

**Compassionate Release/Resentencing.**

9. On May 12, 2021, the court granted Defendant's request for compassionate release, and re-sentenced Defendant to 98 months of incarceration followed by a five year term of supervised release. At the time, Defendant assured the court he would not re-offend.

10. Defendant's supervision commenced on February 10, 2023, and is set to expire on February 9, 2028.

**The Petition and Amended Petition.**

11. A Petition on Probation and Supervised Release was filed on May 23, 2023, alleging Defendant had submitted a urine specimen that confirmed positive for cocaine and the cocaine metabolite. Defendant initially denied use but, on August 1, 2023, admitted that he had cocaine in his system. He claimed to be unaware of the cocaine's origin. The court found this claim untruthful, but accepted his admission. The court set out sentencing for ninety days to determine whether Defendant could bring himself into compliance with his conditions of supervised release.

12. On September 8, 2023, an Amended Petition on Probation and Supervised Release was filed with the court charging Defendant with an additional violation of being charged with the crime of Unlawful Restraint in the First Degree, a felony, for which the Vermont Superior Court found probable cause. This court issued a warrant for Defendant's arrest. He was arrested on September 11, 2023, and has been in custody since that date.

---

which, in turn, requires the crimes share distinctive characteristics that demonstrate a "signature quality").

**The Affidavit in Support of Probable Cause of Unlawful Restraint Charge.**

13. On September 7, 2023, Daniel Clark, the alleged victim of the state court Unlawful Restraint charge, was found by law enforcement hiding in a hotel room. He claimed he was hiding because he was afraid of Defendant. He agreed to provide a sworn statement to Vermont State Police ("VSP") Corporal Christopher Loyzelle and indicated that he was a recovering addict who had relapsed after living with Defendant whom he alleged was selling crack cocaine out of their joint residence at 94 River Street ("94 River Street") in Rutland, Vermont. Mr. Clark told Corporal Loyzelle that Defendant uses the females in the residence to hold his drugs so that he will not have them on his person if arrested. Mr. Clark "advised that Paige was extremely violent, angry and threating to assault him multiple times." Defendant's Exhibit A at 1, ¶ 4.

14. In his sworn statement to Corporal Loyzelle, Mr. Clark further reported that, on August 23, 2023, Defendant accused him of stealing his money and "tied his hands behind his back using HDMI Cords and placed him face down on his bed for an extended period of time." *Id.* at 2, ¶ 4. "Clark advised he was scared that he was going to be assaulted" and "was very worried about the repercussions of talking to the police." *Id.* Corporal Loyzelle observed that "Clark was visibly scared and reluctant to speak to me." *Id.* at 1, ¶ 4.

15. Subsequent to providing his sworn statement that formed the basis of the affidavit in support of probable cause for the felony Unlawful Restraint in the First Degree charge, Mr. Clark could no longer be found, and the charge was dismissed.

**The Federal Bureau of Investigations ("FBI") Report of Interview.**

16. On January 8, 2024, law enforcement agents for the FBI and the VSP interviewed Mr. Clark. Among other things, the FBI agent recorded the

following information from that interview. In or about March 2023, Defendant moved in 94 River Street where Mr. Clark was living. Mr. Clark and Defendant worked together at Westminster Cracker Company. Mr. Clark purchased cocaine at least once from Defendant at work. He used the cocaine to get through the night shifts at work. After Defendant and Mr. Clark began living together, Mr. Clark purchased one gram of powder cocaine from Defendant ten to fifteen times.

17. In approximately June or July 2023, Mr. Clark saw Defendant in possession of powder cocaine, cocaine base, and heroin. He described the amount of these drugs and the source city where Defendant was allegedly obtaining them. Mr. Clark advised that he knew Defendant was on federal supervision.

18. Mr. Clark identified by name two individuals Defendant allegedly used to distribute controlled substances.

19. The FBI agent recorded Mr. Clark's admission that he had stolen Defendant's Xbox and sold it. Mr. Clark admitted he lied to Defendant and claimed his girlfriend (whose name was provided) had borrowed the Xbox. He admitted he sold the Xbox and identified the name of the person to whom he sold it. He stated he had used the proceeds to purchase marijuana, a vape pen, and cigarettes. He advised that, in or about August of 2023 or early September of 2023, Defendant had used an HDMI cord to tie his feet together and a long cell phone cord to tie his hands behind his back in an effort to get Defendant's Xbox back. Mr. Clark was able to untie himself and left 94 River Street for the hotel in which he was found by Corporal Loyzelle. Mr. Clark advised that he learned Defendant had come to the hotel looking for him. He provided the name of the security guard at the hotel with whom he interacted.

20. Mr. Clark told the FBI and the VSP that he saw Defendant in possession of three different handguns: a silver colored .45 caliber firearm, a mini black

|     | colored firearm, and a hunter green colored 9mm Glock (or similar style) handgun. |
| --- | --- |
| 21. | Mr. Clark identified by name two of Defendant's alleged criminal associates and stated he had accompanied Defendant to one of their apartments, where the occupant (who was identified by name) "cooked" cocaine powder into cocaine base inside the apartment while Defendant and Mr. Clark waited. |
| 22. | Sometime in the summer of 2023, Defendant asked Mr. Clark to hold cocaine, heroin, and firearms inside his bedroom so Defendant would not get into trouble if federal probation searched his bedroom. When Mr. Clark refused, the relationship between Defendant and Mr. Clark became strained. |
| 23. | The FBI Report contained the following statement by Defendant: |

> [Defendant] provided "Lo-Jack" with controlled substances and "Lo-Jack" did not have the correct amount of money to give to [Defendant]. In the kitchen of the apartment, [Defendant] placed plastic wrap over "Lo-Jack's" head and face, held him on the floor and threatened to put a butter knife down his throat. "Lo-Jack" begged for his life through the plastic wrap.

(Doc. 280 at 8.)

| 24. | Mr. Clark identified the person who told him that it would be in his (Mr. Clark's) best interests to not show up for court and testify if he valued his safety. Mr. Clark advised the FBI and the VSP that he understood this message to come from Defendant. The message was delivered by the same named individual who cooked the cocaine into crack and who was identified as a person who sold drugs on Defendant's behalf. |
| --- | --- |
| 25. | Mr. Clark's statements to law enforcement were detailed; self-incriminatory; provided names, locations, and activities that could be corroborated or found untruthful; and placed Mr. Clark at risk for physical harm and retribution not only from Defendant but from several other named |

6

       individuals if the contents of his statements to law enforcement were disclosed.

26. At the conclusion of the interview, an FBI agent served Mr. Clark with a subpoena to testify at the court's evidentiary hearing on January 18, 2024.

**The Court's Evidentiary Hearing.**

27. Mr. Clark met Defendant at Westminster Cracker Company where they both worked the same shift. He stated that on several occasions Defendant provided him with small amounts of cocaine to help him work through the night shift which was from 6:00 p.m. to 6:00 a.m. He introduced Defendant to Robert Cann, the leaseholder of 94 River Street, where Mr. Clark was living and Defendant moved in there as well.

28. Mr. Clark claimed to have purchased cocaine from Defendant "a handful of times," which he defined as "like five times" and "anywhere between five and ten times," although he claimed it was hard to remember.

29. Mr. Clark saw Defendant with heroin in a sandwich baggie "maybe a quarter of the way" full.

30. Mr. Clark claimed he saw Defendant with four to six grams of cocaine at a time.

31. Mr. Clark testified that he had stolen an Xbox from Defendant, not money. He described an incident of being placed on the bed and tied up at his feet and hands by Defendant consistent with his description of this event to the FBI and the VSP. He could not provide the exact date of the incident other than "around the end of August." He did not claim he could not breathe or that he suffered bodily injury. After he was restrained, he waited approximately twenty minutes and untied himself. He did not consent to be restrained. He admits that Defendant appeared to be trying to scare him in order to obtain his Xbox rather than to hurt him.

32. Mr. Clark testified regarding the alleged assault against "Lo Jack" and asserted the Defendant beat up Lo Jack in the kitchen of 94 River Street because he owed him money and did not pay him. Mr. Clark described Defendant slapping Lo Jack, pushing him to the ground, and kicking him. Mr. Clark tried to get Defendant to stop the alleged assault. Defendant told Mr. Clark to obtain saran wrap and told Mr. Clark that he planned to wrap Lo Jack's head and face with the wrap. He recalled something about a butter knife but was "not a hundred percent sure about it." His recollection was refreshed by Government's Exhibit 2 and he testified consistently with his statements to the FBI and the VSP about the threatened use of a butter knife.

33. Mr. Clark denied knowing how Defendant used his drugs or whether he used women to hold them for him. He testified that the firearms were hidden in the house in the kitchen and in the living room. He was not asked where. He denied having seen Defendant holding a firearm or seeing a firearm in Defendant's bedroom. His testimony in court regarding the quantity of drugs and the nature and location of firearms was general and provided few details.

34. Mr. Clark admitted that he was afraid to testify in the state court and had been warned by an identified person he described as affiliated with Defendant not to appear there if he wanted to act in his own best interests.

35. Mr. Clark has a criminal history that includes thefts and contempt of court, as well as a felony charge and pending charges in New York. He has struggled with homelessness and with substance abuse.

36. Mr. Clark and Defendant also worked at Denny's together. Mr. Clark denied repeatedly seeking his paycheck from Denny's after he was suspended from work there for "no call/no show."

37. Mr. Clark appeared fearful and reluctant to testify. He did not make eye contact with Defendant. He left the courtroom after he testified.

38. The court finds Mr. Clark minimized the evidence that was adverse to Defendant as well as his own criminal culpability. The court, however, further finds Mr. Clark's testimony generally credible and similar in material respects to the sworn statement he provided to Corporal Loyzelle and his interview with the FBI and the VSP.[4]

39. Defendant called Robert Barrows, a childhood friend, to testify on his behalf. Mr. Barrows worked with Defendant and Mr. Clark at Denny's. He credibly testified that Mr. Clark repeatedly asked for his paycheck from Denny's after he was suspended.

40. Mr. Clark told Mr. Barrows that he did not know why Defendant was arrested when he clearly did. The court finds that Mr. Clark lied to Mr. Barrows and was not truthful with the court regarding how many times he asked for his paycheck from Denny's.

41. Defendant also called his and Mr. Clark's former roommate, Robert Cann, to testify. Mr. Cann has no criminal record and credibly testified that he does not use controlled substances. Mr. Cann has four dogs and was the leaseholder of the 94 River Street apartment. He had several roommates including Defendant and Mr. Clark. He credibly testified that he "kicked out" Mr. Clark and several other roommates with the exception of Defendant.

---

[4] Mr. Clark's testimony was self-incriminating in numerous respects. *See United States v. Harris*, 403 U.S. 573, 583 (1971) (plurality opinion) ("People do not lightly admit a crime and place critical evidence in the hands of the police in the form of their own admissions. Admissions of crime[] . . . carry their own indicia of credibility[.]"); *United States v. Rowell*, 903 F.2d 899, 903 (2d Cir. 1990) (holding that an informant's reliability was established by, among other things, his admission "that he had personally purchased cocaine from [the defendant]"). Although Mr. Clark's testimony in court failed to provide the same specificity as his statements to law enforcement, the court finds that the inconsistencies between his prior statements and his testimony relate to details, not the essence of the acts described, and do not undermine the reliability of his testimony in court.

42. Mr. Cann credibly described himself as a "very nosy" person who helped his neighbors install and maintain surveillance systems. He testified that he routinely went through his roommates' bedrooms, as did his dogs, and he claimed he would know if Defendant had a firearm and controlled substances.

43. Although Mr. Cann had an array of interior and exterior surveillance cameras, after Defendant and Mr. Clark as well as others came to live with him, the interior cameras were disconnected, tampered with, removed, or broken. Mr. Cann reviewed the surveillance footage before the cameras were tampered with and found no evidence of drug possession or firearms.

44. Mr. Cann admitted he worked a different schedule from Defendant and Mr. Clark who both worked the night shift together at two different employers.

45. Mr. Cann allowed Mr. Clark to live with him even though he believed Mr. Clark had stolen from one of Mr. Cann's elderly neighbors. He picked Mr. Clark up from New York and brought him to the 94 River Street apartment. Initially, Mr. Clark paid rent but when he relapsed and resumed using drugs, which, according to Mr. Cann, "could have been any pills," Mr. Cann sought to "kick him out" of the apartment.

46. Mr. Cann credibly testified that he found pills and crushed up pill powder in Mr. Clark's room. After Mr. Clark left, he found a crack pipe in Mr. Clark's bedroom.

47. Although Mr. Cann initially claimed not to be familiar with a person named Lo Jack, he admitted he knew someone named "Jack" that Defendant helped Mr. Cann "kick out of the house." Mr. Cann testified that Defendant was able to remove "Jack" "without putting his hands on him." This incident appears to be a different incident than that described by Mr. Clark.

48. Mr. Cann claims Mr. Clark "harassed" him after he "kicked him out" of 94 River Street by asking for a statement where he lived (presumably for a

10

purpose unrelated to this case) and testified that other "people" were requesting the statement on Mr. Clark's behalf as well.

49. Mr. Cann believes Mr. Clark may have fabricated the assault so that he could take Defendant's place in the apartment after Defendant was arrested.

50. Mr. Cann testified he has not seen Defendant violent, angry, or threatening. He has never seen him in possession of firearms. He asserts that Mr. Clark never advised him that Mr. Clark had been assaulted by Defendant.

51. Mr. Cann maintained a relationship with Defendant after Defendant was arrested and had a conversation with Defendant from jail the day before the court's hearing. Neither party elicited the contents of that conversation.

52. The court finds Mr. Cann's testimony heavily biased in favor of Defendant and heavily biased against Mr. Clark to the extent it rendered his testimony not credible regarding the incriminating evidence against Defendant. The court, however, credits Mr. Cann's incriminating testimony against Mr. Clark. It further finds that Mr. Cann's belief that Mr. Clark fabricated an assault so that he could resume living at 94 River Street speculative and wholly incredible. In other respects, the court finds Mr. Cann's testimony generally truthful.

## CONCLUSIONS OF LAW

### I. Whether the Court Should Consider Evidence from the PSR.

Because the government urged the court to consider evidence from the PSR in rendering its findings of fact, the court provided the attorneys with an expedited opportunity to brief whether this information should be considered. The parties completed their supplemental post-hearing briefing on February 15, 2024.

The government argues that courts routinely rely on PSRs in supervised release violations, especially when the court has adopted that information as its findings of fact at

sentencing, as the court did here.[5] The government points out that although Defendant contested this evidence at sentencing, after an evidentiary hearing, the court concluded that its reliability had been established and it should remain in the PSR. The government seeks to use the PSR evidence to bolster Mr. Clark's credibility and as evidence of a modus operandi. The government also points out that the Rules of Evidence do not apply[6] and that any concern about the misuse of Rule 404(b) evidence is primarily directed to when 404(b) evidence is presented to a jury rather than a judge.

Defendant contends that consideration of the PSR violates Due Process and the Confrontation Clause although he does not cite a supervised release violation case in which a court has rendered a similar finding.[7] He contends Mr. Clark lied to the court in numerous respects as outlined in Defendant's post-hearing brief (Doc. 280) and that Mr. Clark's description of Defendant's alleged assault of Lo-Jack and presumably Defendant's assault of Mr. Clark are reminiscent of an HBO series called *Dexter* and "a trope of horror and slasher genres." *Id.* at 8 n.3.

The court finds that, in a supervised release violation hearing, it may consider a PSR adopted as its findings of fact at sentencing without violating the Due Process Clause or the Confrontation Clause. This evidence has been fully disclosed to Defendant. Defendant had an opportunity to contest the evidence at his sentencing hearing and he did so. He had an opportunity to cross-examine witnesses to his credible threats of violence

---

[5] *See United States v. Castelli*, 550 F. App'x 91, 94 (3d Cir. 2014) (stating "as the District Court correctly noted, it could take judicial notice of" information contained in a PSR).

[6] *See United States v. Bari*, 599 F.3d 176, 179 (2d Cir. 2010) (concluding that in a supervised release proceeding, the court "need not comply with the Federal Rules of Evidence . . . so long as their findings are based on 'verified facts' and 'accurate knowledge'"); *accord United States v. Howard*, 737 F. App'x 35, 36 (2d Cir. 2018) (summary order).

[7] *See United States v. Parker*, 840 F. App'x 654, 646 (2d Cir. 2021) (noting that "a revocation defendant[] . . . has fewer, not more, due process rights than a criminal defendant") (footnote omitted); *United States v. Maloney*, 513 F.3d 350, 356 (3d Cir. 2008) (ruling that revocation of supervised release proceedings are subject only to "minimum requirements of due process") (internal quotation marks omitted); Fed. R. Crim. P. 32.1(b)(2)(B)-(C) (requiring only "disclosure of the evidence against" a defendant and the ability to "question any adverse witness unless the court determines that the interest of justice does not require the witness to appear").

and he did so. To insist that the government recall those same witnesses to re-establish the facts in the PSR is unsupported by any authority.

Here, however, Defendant's past conduct has limited relevance and does not establish a modus operandi as the incidents in question do not reflect a signature crime. The PSR evidence does, however, buttress a conclusion that Mr. Clark's testimony regarding the Lo-Jack assault and the assault against him are not far-fetched, fantastical, or incredible. To the contrary, the court has found Mr. Clark's accounts of these events generally credible.

## II.  The Supervised Release Evidence.

Defendant was placed on supervised release and had the following conditions:

Mandatory Condition 1: You shall not commit another federal, state, or local crime.

Mandatory Condition 3: You must refrain from any unlawful use of a controlled substance.

(Doc. 257.) As noted above, Defendant has admitted to a violation of Mandatory Condition 3, the only question is whether he violated Mandatory Condition 1.

Pursuant to 13 V.S.A. § 2407, "[a] person commits the crime of unlawful restraint in the first degree if that person: (1) knowingly restrains another person under circumstances exposing that person to a risk of serious bodily injury[.]" Under Vermont law, a lesser included offense of felony first degree unlawful restraint is second degree unlawful restraint: "[a] person commits the crime of unlawful restraint in the second degree if the person[] . . . knowingly restrains another person." 13 V.S.A. § 2406(a)(3). "Unlawful restraint in the second degree is punishable by imprisonment for not more than five years or a fine of not more than $25,000.00, or both." *Id.* at § 2406(c).

A person charged with a crime has notice of a lesser included offense for purposes of a supervised release violation. *See United States v. Parker*, 840 F. App'x 654, 656 (2d Cir. 2021) ("[A] criminal defendant receives adequate notice of lesser included offenses from the presence in an indictment of the corresponding greater offense. The same conclusion applies to the offenses identified in a violation petition against a revocation

defendant[.]") (footnote omitted).

In this case, the court finds that the government has not established by a preponderance of the evidence a risk of serious bodily injury.[8] Mr. Clark did not claim he suffered serious bodily injury and he did not identify any risk that he would suffer one. *See* 13 V.S.A. § 1021(a)(1) (defining "serious bodily injury" as including "(i) a substantial risk of death; (ii) a substantial loss or impairment of the function of any bodily member or organ; (iii) a substantial impairment of health; or (iv) substantial disfigurement[.]"). By his own admission, Mr. Clark believed Defendant was trying to scare him and obtain his stolen Xbox rather than injure him when he tied him up.

The government has, however, established by a preponderance of the evidence the lesser included offense of unlawful restraint in the second degree because it has proven that Defendant knowingly restrained Mr. Clark without his consent. This, too, is a felony offense under Vermont law.

The government has further established that, on at least five occasions, Defendant provided Mr. Clark with cocaine in small amounts, that Defendant possessed heroin on at least one occasion, and that Mr. Clark witnessed an assault by Defendant of an individual named "Lo Jack" or "Jack."

The court does not find Defendant's possession of firearms has been established by a preponderance of the evidence. Likewise, the government has not established by a preponderance of the evidence Defendant distributed or possessed a specific quantity of controlled substances other than the cocaine Defendant provided to Mr. Clark.

---

[8] *See, e.g., United States v. Franco*, 2023 WL 6882412, at *4 (S.D.N.Y. Oct. 18, 2023) (finding in a supervised release proceeding "[t]he Government did not introduce evidence to support the conclusion that the victim suffered serious physical injury . . . [because] [t]he record contains no evidence of substantial risk of death, protracted impairment of health or loss of bodily function" as required by New York law for an assault in the second degree but concluding a lesser included offense was established).

14

## CONCLUSION

Based on the foregoing, the court concludes that the government has proven by a preponderance of the evidence that Defendant violated the following conditions of his supervised release:

> Mandatory Condition 1: You shall not commit another federal, state, or local crime.
>
> Mandatory Condition 3: You must refrain from any unlawful use of a controlled substance.

"The court may . . . revoke a term of supervised release . . . if the court . . . finds by a preponderance of the evidence that the defendant violated a condition of supervised release[.]" 18 U.S.C. § 3583(e)(3). Having made this finding, the court hereby revokes Defendant's term of supervised release and schedules this matter for sentencing.
SO ORDERED.

Dated at Burlington, in the District of Vermont, this 22nd day of February, 2024.

Christina Reiss, District Judge
United States District Court